# United States Court of Appeals
## For the First Circuit

Nos. 06-1274, 06-2390, 06-2391, 06-2392, 06-2569, 07-1086

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL A. DECOLOGERO; JOHN P. DECOLOGERO, JR.; PAUL J. DECOLOGERO;
JOSEPH F. PAVONE,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Merritt,[*] Senior Circuit Judge,
and Howard, Circuit Judge.

Alexander Bunin for appellant Paul A. DeCologero.
Mark W. Shea with whom Jean C. LaRocque and Shea, LaRocque &
Wood, LLP were on brief for appellant John P. DeCologero, Jr.
Jeanne M. Kempthorne with whom Doug Cannon and Law Office of
Jeanne M. Kempthorne were on brief for appellant Paul J.
DeCologero.
Raymond Mansolillo for appellant Joseph F. Pavone.
Kirby A. Heller, Attorney, Criminal Division, United States
Department of Justice, with whom Michael J. Sullivan, United States
Attorney, Timothy Q. Feeley, Assistant United States Attorney, and
Christopher F. Bator, Assistant United States Attorney, were on

---

[*]    Of the Sixth Circuit, sitting by designation.

brief for appellee.

---

June 23, 2008

---

**LYNCH**, **Chief Judge**. Paul A. DeCologero ("Paul A."), his nephews Paul J. DeCologero ("Paul J.") and John P. DeCologero, Jr. ("John Jr."), and their friend Joseph F. Pavone appeal their assorted RICO,[1] robbery, drug dealing, witness tampering, firearms, and related conspiracy convictions. After a thirty-nine day trial on eighteen counts, each defendant was found guilty on some and acquitted on other of the charges. Each now raises multiple claims on appeal regarding the management of the trial, evidentiary rulings, the sufficiency of the evidence against them, and other discrete matters.

We affirm the convictions and also reject John Jr.'s sentencing appeal.

I.

Because three of the defendants question the sufficiency of the evidence behind their convictions, we relate the facts in the light most favorable to the verdict. United States v. Soto-Beníquez, 356 F.3d 1, 14 (1st Cir. 2004). We trace the general contours of the case here and leave further recounting for the analysis of particular arguments.

Paul A. ran a criminal enterprise (the "DeCologero crew") based out of a gym he operated in Woburn, Massachusetts. Paul J., John Jr., Pavone, and other associates assisted Paul A. in his

---

[1]    Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

efforts to control a portion of Boston's drug trade. Part of the crew's modus operandi was to beat up and to steal drugs and cash from other drug dealers. Aislin Silva, a young woman who was a friend of crew member Stephen DiCenso, was murdered and dismembered in an effort to protect the crew's activities.

Each defendant was convicted of conspiracy to engage in a pattern of racketeering activity, 18 U.S.C. § 1962(d), as well as the substantive offense of engaging in a pattern of racketeering activity, 18 U.S.C. § 1962(c). These convictions required that each defendant be found to have committed at least two predicate racketeering acts, which could be either state or federal crimes. A table of the counts and racketeering acts is provided in the appendix. We summarize the racketeering acts for which at least some of the defendants were convicted.

A.    Soccorso Robbery - 1995[2]

In 1995, Paul A. sent John Jr. and Thomas Regan to the house of Philip Soccorso, a marijuana dealer, to steal drugs from him. Regan tricked Soccorso into leaving his house and then forced him into their car at gun point. When Soccorso refused to disclose the location of his drugs, Regan and John Jr. drove to Paul A.'s house to pick him up and, as Regan recounted, Paul A. "read [Soccorso] the riot act" about dealing drugs in Paul A.'s

_____

[2]    There was conflicting testimony about the exact date of this criminal episode, but it appears to have occurred at some point in 1995.

-4-

territory.  To add emphasis, John Jr. hit Soccorso with a handgun.
Eventually Soccorso told them that his supplier, Gary Ramus, who
was back at Soccorso's house, might have some drugs.  They returned
to the house, and Regan forced Ramus into the car at gunpoint.[3]
After some more haranguing (also at gunpoint), Soccorso and Ramus
agreed to give Paul A. the marijuana stashed at Soccorso's house.

Regan, Ramus, and Soccorso testified for the government
at trial.  The jury found that Paul A. and John Jr. had committed
the racketeering acts of armed robbery, the kidnaping of Soccorso
and Ramus, and possession of marijuana with intent to distribute.

B.        Pesaturo Robbery - November 1995

Around November 1995, Paul A. agreed with Regan that
Richie Pesaturo, another drug dealer, needed to be taught a lesson
because he owed Regan money and had been "running his mouth" about
the crew.  On Paul A.'s orders, Regan, Paul J., and John Jr. went
to Pesaturo's apartment, where John Jr. and Regan beat Pesaturo and
Regan "read[] him the riot act."  The three crew members then
ransacked the apartment until they found Pesaturo's cocaine supply
and $11,000.  Before leaving, the three men bound Pesaturo and his
roommate Richard Bentley, who had returned home during the course
of the robbery, with duct tape.  They then went to Paul A.'s place
to divide up the proceeds.

_____

[3]     This is Regan's version of the order of events.  Soccorso
and Ramus testified that Paul A. was picked up after Ramus was
forced into the car.

Regan and Bentley testified at trial about this robbery and beating. The jury found that Paul A., John Jr., and Paul J. had committed the racketeering acts of robbery under the Hobbs Act,[4] the kidnaping of Pesaturo and Bentley, and possession of cocaine with intent to distribute.

C.        Finethy Extortion - January/February 1996

In January or February 1996, Paul A. sent John Jr. and Pavone to the house of Shane Finethy, who sold marijuana on Paul A.'s behalf. Finethy had kept $8000 in proceeds from drug sales without Paul A.'s permission, using it for a down payment on a house, and had failed to pay Paul A. back. Upon arrival, John Jr. realized that Finethy had sold the house in question and was preparing to move. John Jr. became angry, and he and Pavone hit Finethy until his face was covered with blood; after Finethy's wife and baby came into the room, Finethy left the house and John Jr. and Pavone followed. Out on the street, they attempted to force Finethy into their car, with John Jr. threatening Finethy at gunpoint. The arrival of a police cruiser broke up the scene, and Finethy returned to his house.

---

[4]    See 18 U.S.C. § 1951(a) ("Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined . . . or imprisoned . . . .").

Finethy and his wife testified at trial, and the jury found that Paul A., John Jr., and Pavone had committed the racketeering act of extortion.

D.      Sapochetti Robbery - October 1996

In the fall of 1996, Kevin Meuse and Derek Capozzi were released from jail and joined the DeCologero crew. That October, the crew planned to rob and kill Albert "Big Al" Sapochetti, a bookmaker and drug dealer. With Paul A.'s agreement, John Jr. and Meuse robbed Sapochetti at gunpoint and beat him, leaving him, his neighbor, and his girlfriend hog tied with duct tape and wires. John Jr. and Meuse threatened to return for more money and told Sapochetti they were sparing his life because of his girlfriend's presence.

Sapochetti's girlfriend testified at trial. In addition to finding that Paul A. and John Jr. had committed the racketeering acts of kidnaping all three victims, the jury also convicted them of using or carrying a firearm, or aiding and abetting such use, during the commission of a violent crime. The government alleged that Paul J. participated in this robbery as well, but the jury found his participation not proved.

E.      Stevens Robbery - October 1996

Also in October 1996, the crew targeted Michael "Slim" Stevens, who was selling marijuana in Paul A.'s territory. Paul A. gave guns to Regan, Capozzi, and Meuse and sent them with Stephen

-7-

DiCenso, another member of the DeCologero crew, to Stevens's townhouse. Regan and Capozzi beat Stevens and threatened to cut off his ear with a knife. Stevens eventually turned over what money he had and led Regan and Capozzi to a stash of marijuana. Before leaving, Regan and Capozzi tied up Stevens, his girlfriend, and another friend of Stevens who had arrived during the robbery.

Stevens, his girlfriend, Regan, and DiCenso testified about this incident at trial. The jury convicted Paul A. of robbery under the Hobbs Act, possession of marijuana with the intent to distribute, and aiding and abetting the use of a firearm during the commission of a violent crime. These crimes, along with armed robbery and kidnaping, were also proved as to Paul A. as racketeering acts under RICO.

F.        North Burglary - October 1996

The crew also burgled the home of Jeffrey North, another marijuana dealer, that same October. When DiCenso told Paul A. that North was in jail pending bail, Paul A. sent DiCenso, Paul J., and Regan to burgle North's apartment. DiCenso broke into the apartment and, with the help of the others, found a cache of weapons, two safes, night vision goggles, and about ten pounds of marijuana.[5] The burglars packed most of the goods into duffel bags

_____

[5]     DiCenso testified that all three men were inside North's apartment. Regan, however, testified that only he and DiCenso went inside the apartment. Paul J.'s father, John P. DeCologero, Sr., also testified that his son had told him that he had remained outside the apartment.

and heaved the safes over the balcony of the apartment to the yard below. They then loaded "the bags, a box of grenades, and the safes" into a car and returned to Paul A.'s house. There Meuse pried open the safes in the presence of the others. The safes contained various firearms, including two MAC-11s (submachine gun/pistol), an Uzi (submachine gun), and another machine gun with a silencer, as well as money and more drugs.[6] Paul A. gave most of the guns to DiCenso to store in the home of Aislin Silva, a nineteen-year-old woman who permitted her friend DiCenso to keep drugs in her apartment on behalf of the crew.

In connection with this burglary, Paul A. and Paul J. were found guilty of conspiracy to possess marijuana with intent to distribute, which the jury also found to be a racketeering act, and of being felons in possession of a firearm.

G.      Silva Witness Tampering and Murder - November 1996

Paul A. went to Silva's apartment later that month with DiCenso and Vincent Marino (a.k.a. Gigi Portalla) to show Marino the guns. On November 5, when DiCenso and Paul J. returned to Silva's apartment on Paul A.'s instructions to pick up some of the guns, they found the police, who had received a tip about the guns,

---

[6]     DiCenso testified that other guns obtained in the North robbery included an AK-47 (assault rifle), an AR-15 (semi-automatic rifle), and a Desert Eagle (semi-automatic pistol), as well as some handguns. Regan put the number of weapons removed from the apartment, other than those in the safes, at six to eight rifles in addition to a box of hand grenades.

already there. When DiCenso and Paul J. entered the apartment, the guns were in plain view on the floor and the police were questioning Silva; they questioned Paul J. and DiCenso as well and then allowed them to leave.

DiCenso and Paul J. reported back to Paul A. and the crew -- Pavone, Meuse, Regan, Capozzi, and John P. DeCologero, Sr. ("John Sr."), the father of John Jr. and Paul J. -- who were gathered at Pavone's house. Paul A. instructed Pavone and Meuse to rent a motel room and sent DiCenso and Capozzi to pick up Silva. Also on Paul A.'s instructions, DiCenso stayed with Silva for the next two nights in different motel rooms. On November 7, another meeting was held at Pavone's house with Silva present. DiCenso testified that he, Capozzi, Meuse, Pavone, and Paul A. were there, though he could not remember at what point Pavone arrived. Paul A. told Silva that their "attorneys were out of town, but they would take care of everything," and that in the meantime, Paul A. would arrange for Silva to be taken on a shopping spree in New York City, accompanied by DiCenso. Pavone drove DiCenso and Silva to New York that night in a limousine that Paul A. had borrowed from an associate, Anthony ("Tony") Bucci. Pavone returned to Boston while DiCenso and Silva spent five nights in New York City.

When DiCenso and Silva returned to Boston on November 12, they went to Pavone's house, where the others were gathered. There, DiCenso, Paul A., and Meuse spoke privately in the kitchen.

-10-

DiCenso told Paul A. that he did not think Silva would "hold up" under police questioning, to which Paul A. responded, "She has to be killed." Paul A.'s first plan was for DiCenso to give Silva some high-grade heroin, telling her it was "really good cocaine"; DiCenso was then to wait until Silva was dead before calling 911 to report the overdose. If Silva did not ingest sufficient heroin to cause a fatal overdose, Meuse was to blow more of it up her nose. To this end, Paul A. sent Paul J. to Antonio Centeno, a heroin dealer in Lowell. Centeno testified that Paul J. asked him for heroin "strong enough for an overdose" and that he sold Paul J. thirty bags of heroin. Although Silva did ingest some of this heroin, it did not have its intended effect. Moving to a new plan, Paul A. told Meuse to kill her.

The morning of November 13, Meuse arrived at DiCenso's apartment, where Silva was staying, and sent DiCenso to the hardware store to buy a hacksaw and sheet metal cutters. When DiCenso returned, Silva was dead, and Meuse told DiCenso he had broken her neck. Capozzi arrived to help, and the three men dismembered Silva's body in the bathtub and packed her remains into trash bags. They drove north, stopping at a Home Depot to purchase lime and a shovel, and buried Silva's remains in the woods along the North Shore. They then disposed of the remaining evidence in a dumpster in Danvers, washed the car, and stopped at a department store to buy three pairs of sneakers and three sweatsuits.

DiCenso testified to the details of the murder described above at trial; his testimony was supported by physical evidence recovered by the police. Paul A., Paul J., and Pavone were all convicted of conspiracy to tamper with a witness and tampering with a witness by misleading conduct; Paul A. and Paul J. were also convicted of tampering with a witness by attempted murder, and Paul A. was convicted of tampering with a witness by murder. These crimes, along with the state-law crimes of murder, attempted murder, and conspiracy to murder, were also found as racketeering acts under the substantive RICO charge.

II.

Paul A., Paul J., John Jr., Pavone, John Sr., and Capozzi were indicted by a federal grand jury in the District of Massachusetts on October 17, 2001.[7]

Paul A. moved to dismiss the RICO charges against him on double jeopardy grounds, an argument based on an earlier trial. The motion was denied; the denial was appealed. In United States

---

[7] On the government's motion, a seventh co-defendant, Daniel Tsoukalas, was severed from the case and tried separately.

Shortly after Silva's murder, DiCenso and his friends overdosed on the heroin originally intended to kill Silva. Two of the friends died; DiCenso survived but suffered serious and permanent injuries. Once the government was able to prove Dicenso was still competent enough to stand trial, DiCenso agreed to plead guilty and testified at this trial through the use of special equipment.

Regan also agreed to testify for the government as part of a plea agreement. Meuse hanged himself in 1997.

-12-

v. DeCologero, 364 F.3d 12 (1st Cir. 2004), this court rejected that appeal.  We explain the background.

In an earlier trial, United States v. Carrozza, No. 4:97-cr-40009-NMG (D. Mass. 1999), Paul A. was prosecuted for helping the Carrozza faction of the Patriarca crime family undertake a violent "war" between 1989 and 1994 in an attempt to wrest control of that criminal organization from Frank Salemme's faction.  See United States v. Marino, 277 F.3d 11, 19-21 (1st Cir. 2002) (describing the factual background of the Carrozza case).  Paul A. was acquitted of all charges in that case, and he argued in his pre-trial motion in this case that the present indictment violated his double jeopardy rights because it alleged the same conspiracy. DeCologero, 364 F.3d at 16-17.  The district court disagreed, and on interlocutory appeal this court affirmed, holding that the two cases dealt with different patterns of racketeering activity.  Id. at 19.  That double jeopardy claim is renewed here based on the evidence actually introduced at trial.

John Sr. pled guilty to a RICO charge on February 28, 2003, and testified for the government at trial.  United States v. Capozzi (Capozzi II), 486 F.3d 711, 714 (1st Cir. 2007).  In July 2004, Capozzi moved to disqualify the attorneys for Paul A., Paul J., and John Jr., arguing they had conflicts of interests.  Id. The attorneys for the three defendants then withdrew, and because of the delay required for the new attorneys to prepare for trial,

the district court, on the government's motion, severed Capozzi's case so that his trial could begin as planned in September 2004. Id. The court gave the remaining four defendants fifteen months to prepare, with the present trial beginning on January 9, 2006. The jury returned its verdict on March 20, 2006. The district court sentenced Paul A. to life imprisonment, Paul J. to 25 years imprisonment, John Jr. to 210 months imprisonment, and Pavone to 72 months imprisonment. This appeal followed.

III.

Because Paul J., John Jr., and Pavone raise similar and overlapping issues on appeal, we consider their claims together.

A.        <u>Severance and Mistrial</u>

Paul J., John Jr., and Pavone argue that the district court abused its discretion in denying their motions, based on several grounds, to sever their trial from that of Paul A. or to declare a mistrial.[8] Those grounds include Paul A.'s alleged admission to being a gang leader, his odd behavior in the courtroom, his responsibility for the heinous act of the murder of Aislin Silva, and the risk of jury confusion. We find no abuse of discretion.

---

[8] The government asserts that John Jr. waived these arguments because his attempt to incorporate the arguments of his co-defendants under Federal Rule of Appellate Procedure 28(i) was insufficient. We do not reach this or other waiver questions as we do not find an abuse of discretion on the merits.

-14-

1.     Standard of Review

Trial judges' decisions regarding severance and mistrial are treated with a considerable amount of deference because appellate courts lack the "first-hand exposure to a case" that better enables trial judges to "strike the delicate balance between fending off prejudice, on the one hand, and husbanding judicial resources, on the other hand." United States v. O'Bryant, 998 F.2d 21, 25-26 (1st Cir. 1993). Thus we review a district court's denial of a motion for severance or motion for mistrial under the same standard: manifest abuse of discretion. United States v. Tejeda, 481 F.3d 44, 54 (1st Cir. 2007), cert. denied, 128 S. Ct. 612 (2007); United States v. Glenn, 389 F.3d 283, 287 (1st Cir. 2004).

The risks of prejudice and jury confusion in this case were not negligible, but they were not uncommon either. By their nature, RICO cases involve many defendants, sometimes with family relationships, and often include multiple repulsive acts. There are ways, with skillful trial management and diligent counsel, to prevent these risks from growing into actual harm. Trial judges "have broad power to cope with the complexities and contingencies inherent in the adversary process." Geders v. United States, 425 U.S. 80, 86 (1976). The trial judge in this case was particularly aware of and sensitive to the complexity of this case and the possibility of jury confusion. DeCologero, 364 F.3d at 20. (An

-15-

earlier case management order splitting off some of the charges into a separate trial was vacated by this court to avoid double jeopardy problems. Id. at 21-25.)

As to severance, "the general rule is that those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources." Soto-Beníquez, 356 F.3d at 29. The district court can, however, sever defendants' trials or provide other relief if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993); see also Fed R. Crim. P. 14(a). If the district court decides not to sever the trial, the defendant bears the burden of making a strong showing that prejudice resulted from the denial of severance, and prejudice in this context "means more than just a better chance of acquittal at a separate trial." United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) (quoting United States v. Martinez, 479 F.2d 824, 828 (1st Cir. 1973)) (internal quotation mark omitted); accord Zafiro, 506 U.S. at 540. "This is a difficult battle for a defendant to win." Boylan, 898 F.2d at 246.

2.    Severance Based on Antagonistic Defenses

Paul J., John Jr., and Pavone argue strenuously that as the trial went on it became clear that Paul A.'s defense was antagonistic to theirs. Antagonistic defenses can require

-16-

severance when they are truly irreconcilable, or at least substantially incompatible. Tejeda, 481 F.3d at 55; United States v. Peña-Lora, 225 F.3d 17, 34 (1st Cir. 2000). "[W]here there is merely some dissonance," however, "we will usually not reverse a trial court's denial of severance." Tejeda, 481 F.3d at 55. Here, the defenses were not truly irreconcilable, nor were they substantially incompatible.

The other defendants characterize Paul A.'s testimony as admitting that he ran a criminal enterprise during the time in question. This, they say, was incompatible with their defense of non-criminality. The record does not support their characterization.

Paul A. testified that he had originally, back in the 1980s, delivered drugs on behalf of Whitey Bulger and Stephen Flemmi, two infamous Boston-area organized crime bosses, but he described his connection with them as minimal and explained that he had refused to continue even in this minimal role after he served his first term in prison (from 1984 to 1992). Paul A. asserted that his refusal irked the mob leaders. His primary defense was that Regan worked for what had become the Salemme faction of the Patriarca Family and was thus motivated to testify falsely against Paul A., setting him up to take the fall for crimes in fact committed by Regan and other followers of Salemme.

In developing this defense, Paul A. did bring up his prior indictment in the Carrozza case, as well as the allegation that the Carrozza and Salemme factions were at odds. In Paul A.'s cross-examination of Regan, there were also some references to "the DeCologero crew," but these were references to what others had alleged, such as the language of the indictment. While this tack might have muddied the waters for the jury, it did not (contrary to his co-defendants' arguments) set Paul A. up before the jury as "an open and notorious underworld figure."

Instead, the jury heard Paul A. flatly deny running a criminal enterprise (the alleged DeCologero crew), insist that he was not affiliated with any organized criminals, and explain repeatedly that only his son (and, on rare occasion, his brother John Sr.) assisted him in his drug deals after his release from prison. While Paul A. admitted that he had continued some limited drug dealing in the mid-1990s, he explained that he stopped such activity once his side business selling high-protein muffins to other gyms started doing well enough to meet his gym's operating deficit. Paul A. admitted knowing Regan, DiCenso, and Meuse, but he denied ever asking them for assistance in any criminal conduct.

The jury could accept Paul A.'s testimony that he was an occasional drug dealer, and even that he was disliked and targeted by mob leaders, while also accepting the other defendants' claims that they had engaged in no criminal wrongdoing. Paul A. did not

-18-

implicate the others, nor did his defense as presented to the jury, if accepted, preclude acquittal of the others. There was no substantial incompatibility.

### 3. Severance Based on "Spillover" Effects and Mistrial Based on Paul A.'s Courtroom Antics

At the core, these three defendants argue that Paul A.'s admitted criminality, the more severe crimes with which he was charged, and his inappropriate courtroom behavior cast a pall over all four defendants, prejudicing his co-defendants before the jury. This tack also fails.

As Justice Jackson famously noted, co-defendants in a conspiracy trial like this one occupy "an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." Krulewitch v. United States, 336 U.S. 440, 454 (1949) (Jackson, J., concurring). Such uneasiness is inherent in joint RICO trials, and the unsavoriness of one's co-defendant (including past criminal conduct) is not enough, by itself, to mandate severance. Tejeda, 481 F.3d at 56. Defendants must still make a strong showing of prejudice to overturn the trial court's decision not to sever.

Paul J., John Jr., and Pavone have also not met that burden with their argument that they suffered from a "spillover" effect due to Paul A.'s prosecution for Aislin Silva's gruesome

-19-

murder. While only Paul A. was on trial for the actual murder of Silva, Paul J. and Pavone were charged with closely related crimes (attempted murder and tampering with a witness) involving the same victim. Further, all four men were convicted of RICO conspiracy, and the scope of that conspiracy included protecting their criminal enterprise by silencing witnesses like Silva. Thus even if some of the defendants were not directly charged with Silva's murder, the murder was still relevant to the RICO counts as it tended to prove the existence and nature of the RICO enterprise and conspiracy. See, e.g., United States v. Diaz, 176 F.3d 52, 103 (2d Cir. 1999). As a result, even if the defendants had received separate trials, evidence of the murder would have been independently admissible against each, and it is far from clear that the potentially prejudicial impact of that evidence would have rendered it inadmissible under Federal Rule of Evidence 403. See Soto-Beníquez, 356 F.3d at 29-30. This is why, "[i]n the context of conspiracy, severance will rarely, if ever, be required" due to evidentiary spillover. United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998) (quoting United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995)) (internal quotation marks omitted).

The defendants' fear of being found guilty by association with Paul A. has a third aspect: his distracting courtroom behavior. Paul A.'s testimony was often unresponsive or tangential, provoking repeated objections from the prosecution and

rebukes from the bench. During the prosecution's case, the judge admonished Paul A. for interfering with the work of his defense counsel, warning that his disruptive behavior was hurting rather than helping him in the eyes of the jury. Generally, however, if "a defendant misbehaves in the jury's presence, the misbehavior usually will not compel a separate trial for his codefendants"; rather, the co-defendant seeking severance or mistrial must "demonstrate the existence of some special prejudice" that the court could not remedy through other means. United States v. Pierro, 32 F.3d 611, 616 (1st Cir. 1994). If the rule were otherwise, co-defendants could provoke mistrials at will. United States v. Tashjian, 660 F.2d 829, 838 (1st Cir. 1981).

Paul A.'s co-defendants do not point to any specific prejudice, asserting more generally that they "were prejudiced by his conduct and the court's inability to rein him in." Nor do they provide any case law to support their argument that such behavior warrants a mistrial. Rather, under the case law, Paul A.'s conduct is not comparable to the severity of other co-defendant outbursts analyzed in prior cases in which we upheld denials of severance motions. See United States v. Mazza, 792 F.2d 1210, 1224 (1st Cir. 1986) (no abuse of discretion in refusal to sever even though co-defendant shouted in middle of witness testimony, "He is lying. I got shot for you, you mother piece of shit. This is my pay back."); Tashjian, 660 F.2d at 837 (no abuse of discretion in

denial of mistrial even though defendant threatened a witness in front of the jury and yelled that his co-defendants were in the mafia). Paul A.'s unruly behavior in the courtroom was unfortunate, but his co-defendants have not made a sufficient showing of prejudice.

Paul A.'s conduct also did not go unchecked by the district court. The court, outside the presence of the jury, told Paul A. to change his behavior, and this had at least some effect on him. For example, before Paul A. began his second day of testimony, the court warned him -- again outside the presence of the jury -- that:

> [T]his is not fun and games. . . . This is a court of law, and there are rules . . . . [Y]ou will answer only the questions that are put to you and not blurt out a whole bunch of other stuff.
>
> I do believe that you are doing that on purpose.
>
> Number one, it doesn't help you. You may wish to look at the jury at times, and you will see that they are not buying it; and, number two, it is improper and inappropriate for you to do that.
>
> It is important for you that the story be told in some reasonably coherent fashion, and you're making it impossible for the story to be told in a coherent fashion; apart from which you are violating the orders of the Court every time you go off on a frolic of your own. So stop doing that. If you don't stop doing it, I will need to take further steps.

-22-

Paul A.'s subsequent testimony, though still subject to objections and occasional reprimands, was more restrained.[9]

### 4. Severance Based on Jury Confusion

In another line of arguments, Paul J., John Jr., and Pavone assert that severance was warranted because of Paul A.'s much greater degree of culpability, the number of crimes for which only Paul A. was on trial, and the similarity of the defendants' names. All of these factors, defendants argue, could easily lead to jury confusion, a type of prejudice that can be grounds for severance. See United States v. Rodriguez-Marrero, 390 F.3d 1, 26 (1st Cir. 2004). Again, we cannot say that the district court abused its discretion.

It is true that "markedly different degrees of culpability" among co-defendants can "heighten[]" the risk of prejudice. Zafiro, 506 U.S. at 539. But again, disparity between the relative culpability of co-defendants does not entitle a defendant to severance. Soto-Beníquez, 356 F.3d at 30; United States v. Welch, 15 F.3d 1202, 1210 (1st Cir. 1993). Prejudice must be shown, and "[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement

---

[9] Defendants also accuse the trial court of refusing to consider their motions for mistrial, and they cite to one instance where the judge denied a mistrial motion on the spot. This argument is off the mark: an instantaneous ruling does not mean that a judge has refused to exercise her discretion. A trial judge immersed in a case is quite capable of ruling on in-court motions quickly, even immediately.

-23-

. . . is far less than the involvement of others, we have been reluctant to secondguess severance denials."  Boylan, 898 F.2d at 246.

Further, such disparity is not uncommon in RICO cases, nor is it unusual in such cases for a co-defendant to be charged with only a subset of the crimes alleged in the indictment.  In Flores-Rivera, for example, this court found no abuse of discretion in the denial of severance for a defendant "named in less than ten percent of all overt acts charged in the indictment."  56 F.3d at 325; see also United States v. Welch, 97 F.3d 142, 147 (6th Cir. 1996) (no abuse of discretion in denial of severance even though defendant was only charged with three of the twenty-nine counts of the indictment).  The RICO counts, of which all defendants were charged and all were convicted, provided the logical scope and overarching unity for the indictment.  See, e.g., United States v. Turkette, 656 F.2d 5, 9 (1st Cir. 1981).

As for the defendants' similar names, defendants appear to assume that the similarities resulted in jury confusion.  We cannot make such an assumption, especially as the jury spent two months in the same room with these defendants and their distinct personalities.  See United States v. Castillo, 77 F.3d 1480, 1491 n.20 (5th Cir. 1996) (dismissing defendants' arguments of jury confusion in trial involving a Thomas Brown, Sr., and a Thomas Brown, Jr., in addition to three other defendants who shared the

-24-

last name of Castillo).   The defendants here have failed to demonstrate any prejudice greater than the "possible risk of prejudice that almost always exists when multiple defendants with different roles are tried together."  United States v. Cresta, 825 F.2d 538, 554-55 (1st Cir. 1987).

Two additional factors cut against the defendants' jury confusion argument.  First, the district court noted to the jury at the outset of the trial that the jury must be careful to consider each defendant separately, a point repeated several times during the jury instructions at the trial's close.  See, e.g., Zafiro, 506 U.S. at 540-41 (noting that proper jury instructions can alleviate risk of prejudice).

Second, and more tellingly, the jury returned highly individualized verdicts: there were some charges for which the jury acquitted all defendants, and others for which the jury convicted some defendants while acquitting others.  Even within some of the charged racketeering acts under the substantive RICO count, the jury found some but not all of the individual, closely related predicate acts proved.  See Appendix.  These were not the verdicts of a jury confused about the identity and culpability of the individual defendants.  See United States v. Houle, 237 F.3d 71, 75 (1st Cir. 2001) ("With regard to the jury's ability to segregate the evidence and understand the judge's instructions, the verdict itself is often quite telling. . . .  This discriminating verdict

shows that the jury was able to compartmentalize evidence and apply it to each defendant . . . ."); Boylan, 898 F.2d at 246; Turkette, 656 F.2d at 9. Given the considerable discretion a district court has to decide a motion for severance or mistrial, these additional factors further indicate that the district court did not abuse that discretion. In sum, we will not second guess the court's decision without a greater showing of prejudice. See United States v. DeLeon, 187 F.3d 60, 63-64 (1st Cir. 1999).

B.      Judge's Trial Demeanor

Paul J., John Jr., and Pavone next argue that the district court judge's criticisms of their counsel in the presence of the jury deprived them of a fair trial. With allegations of judicial bias, we consider whether the comments were improper and, if so, whether the complaining party can show serious prejudice. Owens v. United States, 483 F.3d 48, 66 (1st Cir. 2007). "Charges of partiality should be judged not on an isolated comment or two, but on the record as a whole." United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988); accord United States v. Candelaria-Silva, 166 F.3d 19, 35 (1st Cir. 1999). As the Supreme Court has noted in the context of the recusal of judges, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . . A judge's ordinary efforts at courtroom administration -- even a stern and short-

-26-

tempered judge's ordinary efforts at courtroom administration --
remain immune." Liteky v. United States, 510 U.S. 540, 555-56
(1994). This was a complex and lengthy trial, handled with skill
by a seasoned trial judge who did not let things get out of
control. The defendants have exaggerated; the record does not
support their claims. The comments of which defendants complain
were few (eleven comments spread over thirty-six days of
testimony), balanced, and reasonable in context.

Defendants first argue that the judge referred to their
objections as "picky" in front of the jury. During the
government's direct examination of DiCenso, defense counsel
repeatedly objected to leading questions, objections which the
court sustained. After the fourth sustained defense objection in
a brief stretch of questioning, the judge addressed the jury:

> Let me explain, members of the jury. I told
> you yesterday that leading questions in
> general are a no-no when counsel conducted
> direct examination, but you can also be too
> picky about that. So, part of the reason that
> I have not always sustained the objection is
> because I thought at times it was a bit too
> picky. There is a certain judgment call that
> one has to make. However, at the moment, [the
> prosecutor] is leading [DiCenso] rather too
> much.

Immediately thereafter, the court ruled sua sponte that the
government was asking another leading question. The court's
"picky" comment had very little to do with the defense; if
anything, the court was reprimanding the government.

Defendants also accuse the court of unfair, sua sponte rulings that defense questions were argumentative. The court was even-handed: at times it raised sua sponte concerns about the government's questioning. There was no preferential treatment. Further, the rulings were correct. The court was trying, in this difficult case, to keep the focus on the evidence.

We do not address additional exchanges regarding objections, but we do note that the court emphasized in its final instructions to the jury that it should not take into account the exchanges between counsel and the bench regarding evidentiary matters:

> In the course of the trial, you have heard many times when counsel rose to object. You should not hold that against them or their clients. It is their right to do that. Indeed, it is their duty to do it. It's the way in which counsel bring to the attention of the Court when they think one or another of what you now know are very complicated rules are not being adhered to.

See Candelaria-Silva, 166 F.3d at 36 ("Assuming arguendo that the trial court exhibited frustration from time to time during this rather lengthy, heated trial, the strong instructions given by the trial court . . . should have eliminated any conceivable prejudice."); Logue v. Dore, 103 F.3d 1040, 1046-47 (1st Cir. 1997) ("jury instructions can be a means of allaying potential prejudice" in this context). In sum, the court's treatment of objections raised by both sides was even-handed and not unfair.

The three defendants also take issue with comments by the court that, they argue, suggested they curtail their cross-examination of witnesses. These comments, too, when taken in context, were appropriate. Defendants do not argue, nor could they, that the district court cut their cross-examination short at any point. Instead, the court at times encouraged counsel to move more rapidly after lengthy questioning about minimally relevant information. We read a comment that counsel should limit his cross-examination to "thirty seconds" as a reflection of the late hour; the court dismissed the jury shortly thereafter, and when questioning resumed the next day, the attorney -- who indeed had very few questions -- was given all the time he needed, without further comment. The same explanation holds for a similar incident earlier in the trial, when the court asked defense counsel to try to conclude cross-examination of a witness that day: the judge's comment that some defense counsel might skip cross-examination altogether might have been a light quip, a reference to the imminent end of the trial day, or an acknowledgment that the remaining counsel might have few or no questions for the witness -- indeed, one counsel did not have any questions, the other two had very few, and no one's questioning was curtailed by the judge.

"Trial judges are justifiably accorded broad latitude to ensure proper courtroom behavior." United States v. Rodríguez-Rivera, 473 F.3d 21, 27 (1st Cir. 2007) (quoting United States v.

Gomes, 177 F.3d 76, 80 (1st Cir. 1999)) (internal quotation marks omitted). Even if such comments could be read as rebukes, a judge, in managing a trial, may rebuke counsel for inappropriate behavior and may reasonably limit cross-examination. Id.; see also Boylan, 898 F.2d at 254. The comments of concern here were appropriate exercises of the court's responsibilities to manage the trial. As the comments were not improper, we do not reach the question of prejudice.

C.      Evidentiary Rulings

      1.      Testimonial Exclusions

Paul J., John Jr., and Pavone argue that several of the trial court's evidentiary rulings were in error and were prejudicial. We review the district court's interpretation of the rules of evidence de novo, but we review the court's application of those rules for abuse of discretion. United States v. Muñoz-Franco, 487 F.3d 25, 34 (1st Cir. 2007). We start with their objections to the court's exclusion of certain testimony.

      a.      Hearsay. Defendants object that the court excluded as hearsay statements which were not. The hearsay rule applies to out-of-court statements "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R.

-30-

Evid. 801(c) advisory committee's note. Defendants argue that two conversations that allegedly occurred at Paul A.'s gym fall into this latter category. The district court's rulings to the contrary were not an abuse of discretion.

Paul A. attempted to introduce these gym conversations through his own testimony and the testimony of his sister JoAnne and a gym employee named Peter Ippolito.[10] We summarize the testimony that defendants desired to introduce. In the first conversation, DiCenso and Silva allegedly came to Paul A. at his gym to seek his help because the guns had been discovered in Silva's apartment and because DiCenso was afraid of how Regan would respond. Paul A., who claimed the guns were not his, asserted that he got angry when he learned that DiCenso was storing the guns for Bobby Luisi, a member of the Salemme faction; Paul A. yelled out Luisi's name and told them, "Get out of here. Those people are trying to kill me." In the end, Paul A. agreed to help DiCenso get a lawyer and called Tony Bucci to request a limousine on their behalf. In the second conversation, Meuse and Regan came to Paul A. and, in a heated argument, told him to "stay out of their business, that that business with Stephen DiCenso and Aislin Silva was their business and had nothing to do with [Paul A.]."

---

[10] Paul A. also objects to the district court's hearsay rulings pertaining to these two conversations, and we incorporate his arguments here.

The court allowed Ippolito to testify that DiCenso and Silva came to the gym, that Paul A. got angry, and that Paul A. yelled out someone's name. But the court did not allow testimony as to the name he yelled out (allegedly "Bobby Luisi"). Ippolito was also allowed to testify that the conversation between Meuse, Regan, and Paul A. took place and that they were "very, very angry," but not to the content of that conversation. Paul A. testified that the conversation with DiCenso and Silva took place, that he tried calling an attorney for them, and that he called Bucci to order the limousine for DiCenso. JoAnne was allowed to testify to much more regarding the first conversation: that the three of them were talking about guns, that Paul A. yelled at DiCenso, "Well, why are you coming to me" because "these are people who are after us," that Paul A. told them to leave the gym, and that he then tried to help DiCenso get in touch with an attorney and called for a limousine.

The rest of the conversations the court excluded on hearsay grounds. Further details from the first conversation, it ruled, were only offered for "the truth that DiCenso had another agenda": that is, to establish that the guns were not Paul A.'s and that DiCenso was not working for Paul A. As for the second conversation, Paul A. argued it was relevant because it showed he "was not in a conspiracy with Regan and Meuse. He was not the leader of an organization where he gave them orders, that they had

their own thing going." The court reasoned, however, that this proffered relevance required the content of the statements -- that the guns and Silva had nothing to do with Paul A. -- to be true. These exclusion rulings were correct.

Defendants argue that the statements should have been admitted as verbal acts, but that label applies to statements which "affect[] the legal rights of the parties." Fed. R. Evid. 801(c) advisory committee's note; see also United States v. Stover, 329 F.3d 859, 870 (D.C. Cir. 2003) ("[Verbal] acts are limited to statements that have independent legal significance, such as contractual offers or inter vivos gifts.").

The defendants perhaps mean to refer more broadly to the category of statements that are not hearsay because they are not offered for their truth. See Stover, 329 F.3d at 870. At trial, Paul A. argued that the conversations were offered to provide context for other actions and events, not to prove the truth of the statements. See United States v. Page, 521 F.3d 101, 106-07 (1st Cir. 2008); United States v. Meserve, 271 F.3d 314, 319 (1st Cir. 2001). Statements that provide "context" only if they are true, however, are still considered hearsay. See Stover, 329 F.3d at 870.

The only relevant context the defendants could point to here was the need to explain why Paul A. called a lawyer for DiCenso. Based on this argument, the court allowed into evidence

testimony to the effect that Paul A. called a lawyer for DiCenso, not because DiCenso worked for him, but as a favor when DiCenso came to him with legal troubles. Defendants have put forward no further argument as to what other contextual background the remaining, excluded statements might provide without relying on the truth of those statements.

Contrary to defendants' assertion, the court did not make broad rulings regarding hearsay, but carefully parsed each proffer, often ruling in defendants' favor in unclear situations. There was no abuse of discretion.[11]

b.      Impeachment. In arguments that overlap with their hearsay arguments, defendants assert that the district court improperly excluded testimony meant to challenge the credibility of government witnesses.

The ability to use extrinsic evidence to impeach a witness by contradiction is linked to the question of hearsay. Generally, extrinsic evidence (such as the testimony of another witness) cannot be used to impeach a witness if it relates only to a collateral matter. Marino, 277 F.3d at 24. This common law rule is a manifestation of the district court's general discretion to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice,

---

[11]      It is also not immediately clear how the exclusion of this testimony, which was meant to further Paul A.'s defense, caused any harm to the other three defendants.

-34-

confusion of the issues, . . . or by considerations of undue delay [or] waste of time." Fed. R. Evid. 403; see also United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993) (citing United States v. Tarantino, 846 F.2d 1384, 1409 (D.C. Cir. 1988)). Evidence is collateral if it is relevant only because it contradicts the in-court testimony of another witness. Marino, 277 F.3d at 24. If what makes the statement otherwise relevant and thus not collateral relies on the truth of the statement, then the statement is hearsay and inadmissable on that ground.[12] See 28 Wright & Gold, Federal Practice and Procedure: Evidence § 6206, at 537 n.14 (1993). The decision on whether a matter is collateral or material is within the district court's discretion. Marino, 277 F.3d at 24.

Defendants take issue with the court's refusal to let a defense witness recount a conversation in which Agent John Mercer allegedly tried to coerce him into testifying for the government. The court ruled that the testimony was only relevant to the extent it bore on Mercer's credibility and was thus collateral. Defendants note that "a witness's self-interest or motive to testify falsely is generally considered to be a non-collateral issue." Beauchamp, 986 F.2d at 4. If the argument is that the defendants were attempting to impeach Mercer not through

_____

[12] For this reason, the gym conversations excluded on hearsay grounds could also not be used to attack the credibility of Regan or DiCenso: the conversations only bear on the witnesses' motive to lie if the content of those conversations is true.

-35-

contradiction but by establishing his bias against defendants and his motive to lie, this argument was not fully developed on appeal and is thus waived. United States v. Zannino, 895 F.2d 1, 17 ("[I]ssues adverted to in a perfunctory manner [on appeal], unaccompanied by some effort at developed argumentation, are deemed waived."). Further, while extrinsic evidence is admissible to show bias, the trial judge still has discretion under Rule 403 to exclude such evidence if it would distract from the main issues of the case. Gomes, 177 F.3d at 81. This ruling was well within the court's discretion given the court's interest in avoiding a mini-trial on Mercer's conduct, which could distract the jury in an already complex case. See Beauchamp, 986 F.2d at 4.

Defendants also argue that the district court should have issued bench warrants for three witnesses. The court refused to do so because the witnesses would only testify to collateral matters in order to contradict government witnesses, such as DiCenso and Regan. The court was correct that the witnesses would not be allowed, under the rules of evidence, to testify on those collateral matters. Further, the court did not abuse its discretion in determining that the proposed testimony of the witnesses, as proffered by Paul A., regarded only collateral matters.[13]

---

[13] The court also did not abuse its discretion in determining that it was not material whether DiCenso's sister had told State Trooper Robert Irwin that she knew DiCenso was dating

-36-

2.     <u>Pre-Trial Identification</u>

John Jr. appeals the denial of his motions to suppress pre-trial identifications made by Soccorso and Bentley, which he argues were based on an impermissibly suggestive photo array. There was no violation of John Jr.'s due process rights in the presentation of this identification evidence to the jury.

Our review of a district court's decision to deny a suppression motion as to identification is plenary, but with the usual deference to any findings of fact. <u>United States</u> v. <u>Brennick</u>, 405 F.3d 96, 99-100 (1st Cir. 2005). A court should exclude an out-of-court identification based on a photo array only in those "extraordinary cases" where there is "a very substantial likelihood of irreparable misidentification," a situation which could result in an unfair trial in violation of the defendant's due process rights. <u>United States</u> v. <u>Henderson</u>, 320 F.3d 92, 100 (1st Cir. 2003) (quoting <u>United States</u> v. <u>de Jesus-Rios</u>, 990 F.2d 672, 677 (1st Cir. 1993)); <u>see</u> <u>also</u> <u>United States</u> v. <u>Holliday</u>, 457 F.3d 121, 125 (1st Cir. 2006). "Short of that point, such evidence is for the jury to weigh . . . , for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are

---

Silva, so it was not improper for the court to curtail the cross-examination of Irwin on this point. Defendants note additional instances of defense witnesses not being allowed to testify to conversations but do not explain why those conversations were relevant, how the court abused its discretion, or why they were prejudiced as a result. <u>See</u> <u>Zannino</u>, 895 F.2d at 17.

not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Manson v. Brathwaite, 432 U.S. 98, 116 (1977).

John Jr. moved before trial to suppress the Bentley and Soccorso pretrial identifications, but the district court denied both motions, holding that "these matters are properly addressed through cross-examination." The district court did not explicitly go through the two-step analysis described below.

At trial, Soccorso and Bentley both testified that they picked John Jr. out of a six-photo array, more than three years after the robbery in Soccorso's case and over two years later for Bentley. That photo array was provided for the jury. John Jr.'s counsel cross-examined both witnesses extensively. He walked each of them through the characteristics of the six photographed men, arguing that four of them clearly did not match the age or hair-style descriptions that the witnesses had provided the police. Under defense counsel's questioning, Soccorso acknowledged that it was dark at the time of his abduction and that John Jr. was sitting behind him for much of their encounter; from Bentley, counsel drew a description of the pain medications Bentley had been taking at the time he made the identification as well as during the trial, and Bentley acknowledged that his doctor had written a letter to the effect that Bentley should not testify because the medications severely affected his recall.

John Jr. also produced an expert witness, Dr. Steven Penrod, to testify about factors that decrease the reliability of witness identifications, many of which factors John Jr. argued to the jury were present in this case. Neither Bentley nor Soccorso made an in-court identification.

John Jr. renewed his motion to suppress before the court charged the jury; that motion was also denied. John Jr.'s counsel then argued repeatedly and at length during his closing that the identifications were unreliable and should be discredited. The court, during its charge, instructed the jury that "if the government's theory is that a particular defendant was a principal, . . . then you need to decide whether the evidence shows he was there, and if so, was he identified by the victim, was it a good or a questionable identification."

We use a two-step analysis when considering whether a pretrial identification procedure raises a "very substantial likelihood of irreparable misidentification": we first determine whether the identification procedure was impermissibly suggestive, and if it was, we then look to the totality of the circumstances to decide whether the identification was still reliable. Henderson, 320 F.3d at 100; see also Holliday, 457 F.3d at 125. At the first step, we consider whether the photo array included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect. Holliday, 457 F.3d at 125-26. "The police

authorities are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification. The police are not required to search for identical twins . . . ." Id. at 126 n.5 (quoting Wright v. State, 175 N.W.2d 646, 652 (Wisc. 1970)) (emphasis added) (internal quotation marks omitted).

As for the second step's totality-of-the-circumstances analysis, the Supreme Court in Neil v. Biggers, 409 U.S. 188 (1972), enumerated five factors for consideration:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention to the crime; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

Henderson, 320 F.3d at 100 (summarizing Biggers, 409 U.S. at 199-200).

Starting with the first step, the photo array for John Jr. was impermissibly suggestive. John Jr. has no unusual features that might complicate the search for others with similar appearances, yet the other photos in the array were not of men who looked similar to John Jr. beyond being white men with short hair. Comparison with the eight-photo array used for the identification of Paul J. is informative. In that array, the eight men appear to be of the same age group, seven of the eight have fairly similar hair, and the overall impression is one of resemblance. The array

-40-

used for John Jr., however, included only six photos, two of which are of men who appear younger than John Jr. and two of which are of men clearly older; one of the latter has a noticeably receding hairline. Two of the men appear more heavyset than John Jr., and at least two have hair that is markedly different and not interchangeable with that of the defendant. In all, only one of the five photos depicts a man as similar to John Jr. as the photos in Paul J.'s array are to Paul J. Further, given the familial resemblance between the brothers, the existence of the other photos in Paul J.'s array makes all the more clear that the police should not have had trouble locating men who resembled John Jr. more closely.

However, given the totality of the circumstances, we conclude that the array did not raise a substantial likelihood of misidentification and that the remaining question of reliability was appropriately left to the jury. Cf. Biggers, 409 U.S. at 200-01. Soccorso spent a substantial amount of time in the car with his assailant; Bentley watched as the crew ransacked his apartment and tied him up. Both witnesses were victims of the crimes and not accidental eyewitnesses whose attention might have been distracted. On cross-examination, despite thorough questioning, both witnesses stood by their identifications. Some of the Bigger factors cut in defendant's favor -- Bentley did incorrectly describe two of the robbers as being the same height, and (more significantly) there

was a lengthy time delay between the crimes and the identifications -- but not all the Biggers factors must point in one direction for an identification to be upheld. See Henderson, 320 F.3d at 100. "[I]t is only in extraordinary cases that identification evidence should be withheld from the jury," id. (quoting de Jesus-Rios, 990 F.2d at 677), and this is not one of them.

The weighing of the factors in this case, however, is a close question, so we also note that the jury was provided with extensive information about the identifications with which to make its own reliability determination. The defendant's counsel did a highly competent examination, eliciting testimony from multiple witnesses that cast doubt on the identifications of John Jr., especially in terms of the Biggers factors. The jury was clearly and properly instructed on the question and had before it a thorough record of why the identification might be untrustworthy. We are thus further reassured that John Jr.'s due process rights were not violated by the submission of the identification evidence, with all of defendant's caveats, to the jury.

### 3. Pavone's Claim of Prosecutorial Misconduct

Pavone argues that his Fifth and Sixth Amendment rights were violated by prosecutorial misconduct. We start by describing the underlying dispute.

Pavone alleges that an old acquaintance, John Dana, and his colleague Wayne David Collins approached him around the time of

-42-

his indictment and offered to hire an attorney on his behalf. That attorney, John Cicilline, did briefly take over Pavone's case. According to Pavone, Collins claimed to have a special, preferential relationship with the FBI, and Dana and Cicilline repeatedly asked Pavone to cooperate with the government. After his initial detention hearing, Pavone was approached by another inmate, Arlindo Dossantos, who warned Pavone that Collins and Dana were FBI informants who hired attorneys for criminal defendants in order to obtain confidential information that they could then pass on to the government. Pavone confronted Cicilline, Cicilline withdrew as counsel, and Pavone's former counsel was reappointed.

Pavone moved to dismiss the indictment against him. He asserted that he had shared confidential information with Cicilline, that Cicilline transmitted that information to Collins and Dana, and that all three "acted with the knowledge and approval of the government." He supported this motion with his own affidavit and that of his mother, who had spoken with Dana on multiple occasions during the time in question. Pavone also moved for discovery of sealed documents filed in Dossantos's prosecution regarding similar accusations against Collins, Dana, and the U.S. Attorney's Office.

In response, the government submitted affidavits from the three Assistant U.S. Attorneys who prosecuted this case. They denied having ever met or communicated with Dana or Collins and

-43-

asserted that, to the best of their knowledge, no one involved in the investigation had obtained any information from Dana, Collins, or Cicilline. One of them also explained that the case was investigated not by the FBI, but by the Drug Enforcement Agency ("DEA"), the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and the Massachusetts State Police. The lead investigators from the ATF (Mercer) and the Massachusetts State Police (Irwin) also submitted affidavits, stating that neither they nor, to the best of their knowledge, anyone else working on the investigation had ever sought or received information from Dana, Collins, or Cicilline.

The district court denied Pavone's motions to dismiss the indictment. Based on the government's affidavits "and in the absence of any contradictory factual support," the court was "not persuaded" that Pavone could show that the government received any confidential information, even if he were allowed access to documents in the Dossantos case. It is this denial that Pavone appeals.

"[T]he government's intrusion into the attorney-client relationship" is not a per se Sixth Amendment violation; there must also be some demonstration of resulting prejudice. United States v. Mastroianni, 749 F.2d 900, 907 (1st Cir. 1984). Because such intrusions pose a serious risk to defendants' constitutional rights, and because it would be unreasonably difficult for most

defendants to prove prejudice, we only require defendants to make a prima facie showing of prejudice by "prov[ing] that confidential communications were conveyed as a result" of the government intrusion into the attorney-client relationship. Id. at 907-08. The burden then shifts to the government to show that the defendant was not prejudiced; that burden is a demanding one. Id. at 908.

Even taking all his allegations as true, Pavone did not show or even allege that Collins and Dana passed any confidential information they received from Cicilline on to the government. "[U]nless [the informant] communicated the substance of the [attorney-client] conversations [to the government] and thereby created at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation." Weatherford v. Bursey, 429 U.S. 545, 558 (1977); see also Greater Newburyport Clamshell Alliance v. Pub. Serv. Co. of N.H., 838 F.2d 13, 20 (1st Cir. 1988) ("Only information communicated to the prosecutor is capable of prejudicing a criminal defendant's sixth amendment rights at trial."); United States v. Dyer, 821 F.2d 35, 38 (1st Cir. 1987) (where "no confidential attorney-client information was relayed to, or obtained by, the prosecution," "[t]he defense suffered no prejudice" and thus no Sixth Amendment violation). We affirm the denial of Pavone's motion to dismiss.

Pavone also makes a related argument that the government improperly withheld Brady material (the Dossantos files) which he claims "contain[] certain and definitive exculpatory material," presumably evidence that Collins and Dana were government informants. Under Brady v. Maryland, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. But "Brady did not create" a "general constitutional right to discovery in a criminal case." Weatherford, 429 U.S. at 559. "To establish a violation of Brady, a defendant must provide the court with some indication that the materials to which he or she needs access contain material and potentially exculpatory evidence." United States v. Brandon, 17 F.3d 409, 456 (1st Cir. 1994).

"[M]ethods of enforcing disclosure requirements in criminal trials are generally left to the discretion of the trial court," and we review Brady determinations for abuse of discretion. United States v. Caro-Muñiz, 406 F.3d 22, 29 (1st Cir. 2005). The district court here concluded that the Dossantos documents would not "suffice to sustain Pavone's burden" in establishing his prima facie case of a Sixth Amendment violation. In light of the record created by the prosecution that there was no contact by the prosecution with Collins and Dana in this case, and in the absence

-46-

of any allegation by Pavone to the contrary, this ruling was plainly correct.

D.        Sufficiency of the Evidence

Paul J., John Jr., and Pavone all appeal their convictions on one or more charges, arguing that the government presented insufficient evidence for a reasonable jury to find them guilty.

We review the sufficiency of the evidence de novo, scrutinizing the record as a whole, drawing all reasonable inferences in favor of the verdict, and avoiding any credibility judgments, to determine whether any rational factfinder could have found each element of the crime proved beyond a reasonable doubt. Muñoz-Franco, 487 F.3d at 41.  "To uphold a conviction, the court need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in 'a plausible rendition of the record.'" United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993) (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).  Further, "evidence sufficient to convict may be entirely circumstantial, with the factfinder remaining free to choose among reasonable interpretations of the evidence."  United States v. Wight, 968 F.2d 1393, 1395 (1st Cir. 1992).

1.     Tampering with Witness by Misleading Conduct

Pavone and Paul J. argue there was insufficient evidence to convict them of witness tampering (of Silva) by misleading conduct.  The witness-tampering law prohibits "engag[ing] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission . . . of a Federal offense."  18 U.S.C. § 1512(b)(3). "Misleading conduct" is further defined, as relevant here, as "knowingly making a false statement" or "intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement." Id. § 1515(a)(3)(A)-(B).  These two defendants were indicted for and convicted of conspiracy to tamper with a witness through misleading conduct, as well as the substantive crime of tampering with a witness or aiding and abetting another to do so; tampering with a witness was also found to be a racketeering act for each under RICO.

At trial, the government argued that the relevant misleading conduct was the isolation of Silva, "all the while telling her that everything would be okay, their lawyers would take [] care [of everything] -- their lawyers would be back in town soon, telling her those things to mislead her about her situation."

According to the government's trial theory, Pavone and Paul J. furthered that plan by being at the meetings where decisions about what to do with Silva were made, by renting hotel rooms, and by obtaining the heroin.

The jury heard testimony that Paul A. and the crew were worried about what Silva had already told the police, made significant efforts to keep her away from the police while weighing the likelihood that she would betray them, and, to encourage her continued isolation and silence, reassured her repeatedly that their lawyers were away temporarily but would take care of everything upon their return.

As for Pavone specifically, DiCenso testified that Pavone was present at the first meeting of the crew right after Silva had been discovered talking with the police; that DiCenso and Paul J. told "everybody [present] what had happened in relation to the discovery of the guns"; and that the mood of that meeting was "[a]n overall general feeling of shock." Regan and DiCenso both testified that following the first meeting and at Paul A.'s behest, Pavone rented a motel room for Silva (which removed her from the apartment where she had met with the police), and Pavone did not deny driving DiCenso and Silva from Boston to New York (an act which made it even less likely that the police could find her). Given that Pavone participated in multiple parts of the scheme, that he spent several hours in a confined space with DiCenso and

-49-

Silva during the drive to New York, that all three meetings about how to handle Silva occurred at Pavone's house, and that he was in the right place at the right time on multiple occasions to have heard the crew discuss the problem of Silva, a reasonable jury could have inferred that he knew the crew was misleading Silva to keep her from talking further with the police. The jury could have easily concluded that Pavone, rather than acting as a simple "gofer," was knowingly assisting with that scheme.

As for Paul J., he was with DiCenso when they went to Silva's apartment and discovered Silva being questioned by the police. He and DiCenso debriefed the crew about Silva's contact with the police at the first meeting. It was reasonable for the jury to infer that the plan to prevent Silva from talking further with the police was hatched at this meeting and that Paul J. was privy to it. Further, when the crew decided to kill Silva with an overdose to ensure that she would not betray them to the police, it was Paul J. who went to buy the heroin. He knew what it was for (he asked Centeno, the dealer, for heroin "strong enough for an overdose"), and it is a permissible inference that he knew the heroin would be provided to Silva under the guise of being a non-lethal drug. From all of this, a reasonable jury could have concluded that Paul J. knew of the scheme to convince Silva not to talk to the authorities and to prevent her from doing so, and that he knowingly assisted with that effort.

These convictions of Pavone and Paul J. are affirmed.

2.      Felon in Possession of a Firearm

Paul J. also appeals his conviction under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm.[14] He does not dispute that he is a felon under the terms of the statute or that the firearms in question were related to interstate commerce. See Wight, 968 F.2d at 1397. Instead he argues that the government did not provide sufficient evidence that he knowingly possessed the six firearms, derived from the North burglary, that it accused him of possessing.

Knowing possession under § 922(g)(1) can be established by proving that the defendant had constructive possession of a firearm; that is, that he "knowingly ha[d] the power and the intention at a given time of exercising dominion and control over a firearm . . . , directly or through others." Id. at 1398 (emphasis added). Constructive possession can be joint, does not require actual ownership of the firearm, and can be established through circumstantial evidence, though "mere presence or association with another who possessed the contraband is insufficient." Id. at 1397; see also United States v. Liranzo, 385

_____

[14] 18 U.S.C. § 922(g)(1) provides that "[i]t shall be unlawful for any person -- (1) who has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

F.3d 66, 69 (1st Cir. 2004). Possession, whether actual or constructive, can be extremely brief: "a minute of possession is as much an offense as a year of possession." United States v. Zavala Maldonado, 23 F.3d 4, 8 (1st Cir. 1994).

There was enough evidence for the jury to find that Paul J. knowingly possessed the North firearms at some point. While other testimony was to the contrary, DiCenso testified that Paul J. was with him in North's apartment during the burglary. See Wight, 968 F.2d at 1395 (credibility issues resolved in favor of government). Even if Paul J. was outside the apartment and helped the other two burglars load the stolen goods into the car, the jury could have reasonably inferred that he knew the duffel bags with the stolen goods contained guns. Paul A. sent them to search for drugs and guns, the weight and shape of the duffel bags would have belied their contents, and the box of grenades, which was loaded into the car separately, would have made clear that the expected weaponry had been found and stolen. The jury could have concluded, then, that Paul J. physically possessed the guns at that time.

Second, a jury could have found that after the North robbery, when the crew was opening the safes in the garage and examining the weapons, Paul J. constructively possessed the firearms. A defendant has the power to exercise dominion over a firearm if he was "close enough to pick it up at any time." United States v. McLean, 409 F.3d 492, 504 (1st Cir. 2005). Regan

described the guns as laid out "all over the garage floor" and specified that at least he and Meuse were physically handling the weapons; it could be inferred that Paul J. had the same access to them. As for the intent to exercise dominion over the firearms, although Paul A. stopped Regan from keeping some of the weapons, the jury could still have concluded that the weapons were being kept for the use of the crew as a whole. As DiCenso put it, "because the guns belonged to the crew, . . . that means they belonged to me, too," as a member of the crew.

The basis for a joint possession finding is also demonstrated by Paul J. and DiCenso having gone to retrieve the weapons from Silva's apartment on behalf of the crew: they assumed that they would be able to remove the weapons at will. The weapons did not belong to Silva; the weapons belonged to the crew, and Paul J. acted as a member of the crew.

We affirm this conviction.

3.    Use of a Firearm in Relation to Crime of Violence

John Jr. appeals his conviction under 18 U.S.C. § 924(c) for using or carrying a firearm "during and in relation to any crime of violence . . . for which he may be prosecuted in a court of the United States." The government based its § 924(c) charge on John Jr.'s robbery of Sapochetti in alleged violation of the Hobbs Act. Thus the government had to prove that John Jr. used or carried a firearm, that his use of the firearm was in relation to

the robbery, and that he did in fact commit a Hobbs Act robbery. To prove a Hobbs Act robbery, the government had to establish that the Sapochetti robbery "in any way or degree obstruct[ed], delay[ed], or affect[ed] commerce." 18 U.S.C. § 1951(a). John Jr. argues the government failed to prove this nexus with interstate commerce.

"The Hobbs Act's scope extends to the limit of Congress' Commerce Clause authority." United States v. Capozzi (Capozzi I), 347 F.3d 327, 335 (1st Cir. 2003). Because of this, and because the Hobbs Act by its terms criminalizes robberies that affect interstate commerce "in any way or degree," the government need only show that the robbery created "a realistic probability of a de minimis effect on interstate commerce."[15] Id. (quoting United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992)) (internal quotation marks omitted). This required showing is "not onerous." Capozzi II, 486 F.3d at 726 (quoting United States v. DiGregorio, 605 F.2d 1184, 1191 (1st Cir. 1979)) (internal quotation marks omitted).

A reasonable jury could have concluded that John Jr. robbed Sapochetti and that the probable effect of that robbery was an impact on interstate commerce, albeit largely illicit commerce. The robbing of a drug dealer typically has the required nexus with

---

[15] This standard is unaffected by United States v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, 529 U.S. 598 (2000). Capozzi I, 347 F.3d at 336 & n.3.

interstate commerce. See, e.g., id.; United States v. Parkes, 497 F.3d 220, 231 (2d Cir. 2007), cert. denied, 128 S. Ct. 1320 (2008); United States v. Ostrander, 411 F.3d 684, 692 (6th Cir. 2005); United States v. Williams, 342 F.3d 350, 355 (4th Cir. 2003) ("Drug dealing . . . is an inherently economic enterprise that affects interstate commerce."); United States v. Bailey, 227 F.3d 792, 798-99 (7th Cir. 2000); United States v. Box, 50 F.3d 345, 353 (5th Cir. 1995). A robbery can affect interstate commerce when it depletes the assets of a business, even if the business is that of drug dealing. See, e.g., Capozzi II, 486 F.3d at 726; Williams, 342 F.3d at 354-55; Bailey, 227 F.3d at 798. It was sufficient for the government to demonstrate that the robbery of cocaine dealers generally affects interstate commerce and that John Jr. intended to rob Sapochetti of money he believed was derived from or intended to finance cocaine sales. See Bailey, 227 F.3d at 798.[16]

DiCenso and Regan both testified that Sapochetti was a known cocaine dealer. The interstate aspect was nailed down by a DEA agent who, testifying as an expert witness, explained that the coca plant from which cocaine is derived is native to South America and is not (to his knowledge) capable of being grown in Massachusetts. From this the jury could conclude that Sapochetti

---

[16]    Thus, contrary to John Jr.'s assertion, under the depletion-of-the-assets theory the government did not have to provide specific proof that the stolen money was connected to Sapochetti's interstate commerce activity.

was engaged in a business that affected interstate commerce. Further, the government presented plentiful evidence that the crew's modus operandi was to rob rival drug dealers of their drugs and drug proceeds, both to decrease competition and to increase the crew's supplies for their own sales. Both DiCenso and Regan testified that the crew obtained around $18,000 from Sapochetti. The jury could have reasonably inferred that John Jr. intended to and did deplete Sapochetti's business assets, thereby affecting interstate commerce to some degree.

John Jr. makes a related argument that the jury's "inconsistent" verdict demonstrated that it did not find an effect on interstate commerce but was confused about the elements of § 924(c) because the judge's instructions on this charge were convoluted. This argument fails. Although the jury did acquit John Jr. on the substantive offense of a Hobbs Act robbery of Sapochetti, "inconsistent verdicts are not sufficient grounds for reversing a criminal conviction as long as the appellate court is satisfied that there was sufficient evidence to support the conviction." United States v. Richard, 234 F.3d 763, 768 (1st Cir. 2000). This is so even where, as here, the jury acquits the defendant of a predicate felony while convicting on the compound felony. United States v. Powell, 469 U.S. 57, 67-68 (1984). We have held that a defendant can be convicted under § 924(c) even if he was acquitted of the drug trafficking crime on which the

§ 924(c) charge was premised. <u>United States</u> v. <u>Figueroa-Encarnacion</u>, 343 F.3d 23, 30 (1st Cir. 2003). At least one other circuit has addressed the specific situation presented by this case and affirmed a § 924(c) conviction where the jury acquitted on the predicate Hobbs Act robbery. <u>United States</u> v. <u>Smith</u>, 182 F.3d 452, 458 (6th Cir. 1999). Because there was sufficient evidence to establish the jurisdictional element of a Hobbs Act robbery, John Jr.'s conviction for using or carrying a firearm during the commission of that offense must be affirmed. <u>See</u> <u>generally</u> 3 Wright, King & Klein, <u>Federal Practice and Procedure: Criminal</u> § 514, at 27-28 (3d ed. 2004) (collecting cases).

Further, the Supreme Court has explicitly rejected any role for individualized assessments of inconsistent verdicts when a defendant argues the inconsistency was caused by a trial error, such as the argument here that the jury instructions were unclear. This is because such inquiries "would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." <u>Powell</u>, 469 U.S. at 66. Indeed, much of defendant's argument on this point takes the form of speculation about what the jury might or might not have believed about the law or concluded about the facts of the case.[17]

---

[17] We also see no error in the court's instructions. The court explained the Hobbs Act, including its jurisdictional element, clearly and at length; contrasted it to the state law

-57-

John Jr.'s conviction under § 924(c) is affirmed.

E.      Sentencing

Finally, John Jr. appeals his sentence on one basis. The jury found that the government had not proved John Jr.'s involvement in racketeering act 13, possession of cocaine with intent to distribute. However, John Jr. had pled guilty to the same offense conduct in 1997 and was sentenced to 249 days of imprisonment. John Jr. argues that the time he served for that crime -- in which calculation he also includes the twenty-one months he served for violating the terms of his supervised release following his 249-day sentence -- should have been taken into account as a sort of mitigating factor in his sentencing in this case. As he put it in his sentencing memorandum to the district court, "[a]t a minimum, an innocent man who serves time should be remunerated for the time he served. [The district court] should sentence below the guideline sentencing range by the same amount of time that the defendant served for the crime that he did not commit, 29 months . . . ." The district court, however, concluded that it "cannot give credit for time served on a sentence that someone else imposed in a case in which Mr. DeCologero admitted guilt" and sentenced John Jr. to 210 months of imprisonment.

crime of armed robbery; and explained that a Hobbs Act robbery constituted a violent federal crime under § 924(c). While the instructions were complicated, so was the case, and the jury had to assist it the redacted indictment and a chart of elements for each crime charged.

We review the substantive reasonableness of a sentence for abuse of discretion, but we first consider whether the court below committed a "significant procedural error, such as . . . treating the Guidelines as mandatory." Gall v. United States, ___ U.S. ___, 128 S. Ct. 586, 597 (2007). To the extent that John Jr. argues that the trial court did not believe it could grant him a variance based on this particular factor, that argument is preserved. On appeal, John Jr. focuses on the trial judge's use of the word "cannot" in her decision not to take the prior conviction into account.

When considering a sentencing appeal, however, we do not look at comments in isolation but consider the sentencing record as a whole. Cf. United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc) ("[A] court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did."). It is clear that the trial court did not consider the Guidelines to be mandatory. The court sentenced John Jr. below the Guidelines range, which it calculated to be between 324 and 405 months. It based this lower sentence on a number of the 18 U.S.C. § 3553(a) factors, especially § 3553(a)(1), and on other factors specific to John Jr.'s case: that the conviction came ten years after the commission of the crimes, that Paul A. and other "elders" (presumably including his father) had "subjected" John Jr. "to

-59-

cruel control . . . most of his life," that John Jr. had "made strides" in changing his life, and that the formal Guidelines calculation double-counted some of the underlying offenses, resulting in an "artificially high" Guidelines range.  We do not doubt that the trial court recognized its discretion to take John Jr.'s prior conviction and imprisonment into account; the court simply did not agree with defendant that his previous incarceration for a crime to which he pled guilty should lead to a sentence reduction.

To the extent that John Jr. argues that the district court committed a Guidelines error by not taking into account a possible downward departure under U.S.S.G. §§ 5G1.3 and 5K2.23, he did not present that argument to the trial court.  We thus review the sentence on this ground for plain error only.  <u>United States</u> v. <u>Goodhue</u>, 486 F.3d 52, 57 (1st Cir. 2007); <u>United States</u> v. <u>Wallace</u>, 461 F.3d 15, 35 & n.11 (1st Cir. 2006).  We pass over the questions of which Guidelines apply (the trial court applied the 1995 Guidelines, in effect at the time of the offense conduct) and whether, if the 1995 Guidelines do apply, the later amendments relevant here were retroactive.  Even taking these questions in defendant's favor, John Jr.'s argument does not survive the plain terms of § 5G1.3.

Under the current Guidelines, § 5G1.3(b) provides for an adjustment of the sentence to account for an undischarged term of

imprisonment that "resulted from another offense that is relevant conduct to the instant offense of conviction . . . and that was <u>the basis for an increase in the offense level for the instant offense</u>." <u>Id.</u> (emphasis added). Application note 4, which cross-references and uses the same language as § 5K2.23, approves the use of a downward departure when the prior term of imprisonment has been fully discharged, as long as the other requirements of § 5G1.3(b) are met. Neither section is applicable here, then, as the offense underlying racketeering act 13 was not taken into account in the Guidelines calculation; much less was it a "basis for an increase in the offense level" in this case.[18] <u>See</u> <u>United States</u> v. <u>Kornegay</u>, 410 F.3d 89, 99 (1st Cir. 2005); <u>see</u> <u>also</u> <u>United States</u> v. <u>Parker</u>, 512 F.3d 1037, 1040 (8th Cir. 2008).

The sentence is affirmed.

IV.

We turn to Paul A.'s appeals but find them likewise unavailing.

---

[18]     The language in the 1995 Guidelines differs slightly but not in a material way.  The older version of § 5G1.3(b) covered an "undischarged term of imprisonment [that] resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense."  Again, the alleged offense conduct covered by racketeering act 13 was not taken into account in the trial court's Guidelines determination.
       The parties also dispute whether that offense conduct, to which John Jr. pled guilty in 1997, was relevant conduct to the instant offense.  We do not need to resolve that question.

A.          Double Jeopardy

This court rejected Paul A.'s pre-trial double jeopardy claims.  DeCologero, 364 F.3d at 19.  Paul A. renews his double jeopardy claim in this post-conviction appeal based on the evidence actually presented at trial.  See United States v. Laguna-Estela, 394 F.3d 54, 59 (1st Cir. 2005).  Our review is de novo.  United States v. Cartagena-Carrasquillo, 70 F.3d 706, 714 (1st Cir. 1995).

In our prior consideration of this issue, we noted that "double jeopardy only bars successive RICO charges involving both the same enterprise and the same pattern of racketeering activity." DeCologero, 364 F.3d at 18.  The court recognized that it was perhaps a "hard question" whether the enterprises in the Carrozza case and this case were the same, but concluded that the patterns of racketeering activity were not.  Id.  Having assessed the evidence post-trial, we reach the same conclusion.

In comparing the charged patterns of racketeering, we consider the totality of the circumstances, including the similarities of "the time, the place, the people, and the nature and scope of the activities involved in each indictment."  Id. Paul A. first argues that the time periods covered by the two trials overlap.  We recognized in our earlier opinion the overlap in the time periods covered by the two indictments but found it insubstantial.  Id. at 19.  We noted then that the Carrozza indictment focused on 1989 to 1994 but that the Carrozza trial included evidence of events occurring as late as 1998.  Id.  The

-62-

DeCologero indictment focused on the years 1995 to 1997, but the prosecution introduced evidence reaching back to 1994. For example, there was conflicting testimony about whether the Soccorso robbery occurred in late 1994 or late 1995, and the prosecution sought to establish that Finethy incurred his drug debt in 1994 as background for the alleged 1996 extortion. These exceptions were minor, however, and Paul A. points to no other instances of proffers of pre-1995 evidence. We again conclude that the overlap between the time periods is insubstantial. Cf. United States v. Ciancaglini, 858 F.2d 923, 929 (3d Cir. 1988) (finding distinct patterns of racketeering activity despite overlap of twenty-five months).

Paul A. concedes that he is the only common defendant between the two indictments, but he argues that does not end the analysis of common participants. We need not address his premise, for in any event, the only common character Paul A. points to is Vincent Marino, a Carrozza defendant, who Paul A. argues is a missing link in the Silva murder. That connection is tenuous, and it does not even suggest that the two indictments charged the same pattern of racketeering activity. Cf. United States v. Russotti, 717 F.2d 27, 33 (2d Cir. 1983) (finding different patterns of racketeering activity even though two individuals were named in both indictments).

Finally, Paul A. points to references in the Carrozza case to robberies of drug dealers in arguing that the two cases

dealt with the same types of crime. First, the references in Carrozza are not new information, derived from the actual prosecution of this case, and thus would not affect the conclusion we reached in the interlocutory appeal. Second, the overlap of some types of crimes between two indictments does not necessarily mean the indictments charge the same pattern of racketeering activity. See, e.g., United States v. Ruggiero, 754 F.2d 927, 933-34 (11th Cir. 1985) (finding different patterns of racketeering activity even though both indictments charged crimes under the same gambling, drug, and robbery statutes). Third, the alleged overlap was minimal.

We thus conclude again that, whether or not the same enterprise was involved, the indictments did charge and the government did try two different patterns of racketeering activity. Taken as a whole and based on the trial records, the Carrozza case "focused on the systematic murder of rival mafia members . . . to seize control of the Patriarca family," while this case focused on "a more conventional collection of robberies and drug trafficking offenses, the single murder being merely a means of protecting the conspiracy from the police." DeCologero, 364 F.3d at 18-19. There has been no violation of Paul A.'s double jeopardy rights by his standing trial in this case.

B.       Ability to Present Defense

Paul A. raises several arguments pertaining to his ability to present his defense theory in full. He claims that the

district court curtailed the testimony of witnesses in violation of his Fifth and Sixth Amendment rights, that the court failed to compel the production of a witness in violation of his Sixth Amendment rights, and that the prosecution withheld exculpatory evidence in contravention of its Brady duties and in violation of his Fifth Amendment rights. These arguments all fall short.

### 1. Trial Management and Evidentiary Rulings

Paul A.'s primary defense was that Regan was aligned with the Salemme faction of the Patriarca Family and thus would not have been working with Paul A. if Paul A. was, as the government had previously alleged, aligned with the Carrozza faction. Paul A. complains that the trial judge curtailed his ability to present this defense by restricting his cross-examination of Regan and other witnesses and by cutting short his own testimony. He argues that these rulings violated his Fifth and Sixth Amendment rights to present his defense.

"Whether rooted directly in the Due Process Clause of the [Fifth] Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 682, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (citations omitted). What constitutes the "basic elements" of a fair trial under the Fifth Amendment is determined "largely through the

several provisions of the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 685 (1984).[19]

However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). For example, the Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted." Crane, 476 U.S. at 690. Thus, "federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. . . . so long as [those rules] are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Scheffer, 523 U.S. at 308 (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

The Supreme Court reaffirmed this principle recently, emphasizing that "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" do not normally breach defendants' constitutional rights. Holmes v. South Carolina, 547 U.S. 319, 326 (2006). In Holmes, the Court

---

[19] As relevant here, the Sixth Amendment protects the accused's right, in a criminal trial, "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI.

specifically noted as one such "well-established rule" the rule that a court may exclude a defendant's evidence proffered to show that someone else committed the crime in question if that evidence is too speculative, remote, or immaterial. Id. at 327, 330.

Paul A. argues that he was unable to question Regan fully during cross-examination about his affiliation with Salemme's group. But the court did allow Regan to be questioned about the structure of the Patriarca family, his association with Frank Salemme Jr., and related issues despite continued objections by the prosecution. The limits which were placed on questioning were based on the judge's well-founded concerns about relevance and were within her discretion. The prohibited questions pertained primarily to events that occurred before 1995 and thus before the crimes alleged in the indictment. There was a risk of jury confusion from this line of questioning in an already complex and confusing case. See, e.g., United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st Cir. 2000) ("The district court 'retains wide latitude to impose reasonable limits' on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material." (quoting United States v. Twomey, 806 F.2d 1136, 1139 (1st Cir. 1986))).[20]

---

[20] Paul A. also complains of restrictions on his ability to present evidence that Regan was somehow involved in Silva's murder, but he does not specify any objectionable rulings. Regardless, the evidence in question is highly tangential and circumstantial; there would have been no abuse of discretion in its exclusion.

Paul A.'s objection to the court's curtailing of his own testimony is also misplaced. Regardless of what theory a defendant might wish to present, that does not entitle him to provide non-responsive (and provocative) answers, even to his own attorney's questions. In addition, much of the information pertinent to Paul A.'s defense came in through the cross-examination of Regan. Finally, Paul A. complains of the court's rulings on the inadmissibility of most testimony pertaining to the gym conversations, but we have already found those rulings not to be in error.[21]

Paul A. was able to present his defense, and the court did not abuse its discretion in restricting the admission of a fraction of his evidence. Cf. O'Brien v. Marshall, 453 F.3d 13, 19-20 (1st Cir. 2006) (no constitutional violation where defendant's evidence that someone else committed the crime was restricted based on traditional hearsay rules); DiBenedetto v. Hall, 272 F.3d 1, 7-9 (1st Cir. 2001) (no constitutional violation where defendant's evidence that others had motive in mob killing and that key government witness was lying to regain favor with mob faction was excluded because it was unreliable and tangential).

2.      Denial of Compulsory Process

---

[21]     Paul A. also alleges that the trial court curtailed his opening and closing arguments, but our review of the record revealed no basis for these allegations.

Paul A. also attempted at trial to show that Vincent Marino, a.k.a. Gigi Portalla, was involved in the North burglary and in Silva's murder, a showing presumably meant to exonerate Paul A. He argues that the district court's refusal to expedite Marino's transport from a federal penitentiary in Pennsylvania or to provide a continuance until Marino's presence could be secured deprived him of compulsory process under the Sixth Amendment.

Paul A. filed his motion for Marino's transport to testify on February 28, two days before the prosecution rested. The district court allowed the motion, but refused to order the U.S. Marshals to expedite their transport process or to provide extra funds to do so. Paul A. moved for a continuance, which the court also denied.

If the court had denied Paul A.'s motion to transport Marino, our review would be for abuse of discretion. United States v. Nivica, 887 F.2d 1110, 1117 (1st Cir. 1989). As the court granted the motion but simply refused to expedite the request, we see no reason why a more stringent standard of review should be used. Trial judges are best situated to weigh the competing demands of trial management -- "factors such as timeliness, materiality, relevancy, competency, practicality, and utility" -- and thus we accord the trial court's determinations in these areas "considerable respect." Id. at 1118.

As the trial court noted, Paul A. submitted his request quite belatedly. There was no reason for that delay. Other

circuits faced with similar circumstances have found no abuse of discretion. Where a defendant waited until seven business days before the trial started to request the production of an incarcerated witness, the Eighth Circuit concluded that, "[i]n view of the modest benefit that [the] testimony might have offered, . . . the district court correctly ruled that the countervailing public interests in the efficient administration of justice were sufficient reason to deny the motion for a continuance of the trial." United States v. Sparkman, 500 F.3d 678, 683 (8th Cir. 2007). The Eighth Circuit also found no abuse of discretion where the trial court denied a further continuance when the marshals could not locate witnesses subpoenaed at government expense (under Federal Rule of Criminal Procedure 17(b)), given that the defendant had waited until the day before trial to request the subpoena. United States v. DeCoteau, 648 F.2d 1191, 1192-93 (8th Cir. 1981). As the Second Circuit succinctly stated, where the defendant had waited until two business days before the beginning of trial to request a continuance so that an incarcerated prisoner could be produced, "any detriment suffered by [the defendant] resulted from his own dilatory conduct and not from the court's ruling." United States v. King, 762 F.2d 232, 235 (2d Cir. 1985). In all these cases, the defendants' efforts to secure the testimony of incarcerated witnesses were considered tardy even though they were made prior to the commencement of trial; Paul A. waited until the twenty-ninth day of trial to make his request. The comparison is

not in his favor.  Further, the proffered testimony of Marino was tangential and potentially cumulative.  Any benefit of the testimony would have been slight.

The Compulsory Process Clause is more a sword than a shield because "[t]he decision whether to employ it in a particular case rests solely with the defendant.  The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct."  Taylor v. Illinois, 484 U.S. 400, 410 (1988).  The fault here lies with Paul A.

### 3.    Brady Disclosures

Finally, Paul A. alleges that the prosecution withheld exculpatory evidence in contravention of its Brady obligations. Again, we review Brady determinations for abuse of discretion. Caro-Muñiz, 406 F.3d at 29.  Paul A. repeatedly requested materials pertaining to investigations of Vincent Marino, specifically evidence linking Marino to Silva's death, but the prosecution opposed and the court denied the motions.

The prosecution represented that it had disclosed all potentially exculpatory material.[22]  Paul A. points to no specific materials or information he believes are in the prosecution's possession that would exculpate him.  Without such a specific request, it is the prosecution "that decides which information must

---

[22]    This included alerting the defense in 2001 and 2002 that a witness (DiCenso) linked Marino to a gun deal gone bad and that a confidential informant had linked Marino to the guns being stored by Silva.

-71-

be disclosed.  Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on [Brady] disclosure is final." Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987) (footnote omitted); see also Brandon, 17 F.3d at 456 (finding insufficient a defendant's "speculat[ion] that the . . . files might contain exculpatory evidence" without "any supporting evidence or arguments to indicate this was, in fact, the case").  There was no abuse of discretion in crediting the prosecution's adamant assertion that it had no further material and exculpatory evidence.

C.        Conflict of Interest

Paul A. requests a new trial based on his trial attorney's alleged conflicts of interest and the trial court's unwillingness to hold an evidentiary hearing on the matter.  We review this question de novo.    Reyes-Vejerano v. United States, 276 F.3d 94, 97 (1st Cir. 2002).

Paul A. alleges that his counsel, John Salsberg, suffered from two conflicts of interests: that his law partner previously represented Jon Minotti, a potential defense witness, and that his associate had previously worked for an attorney who had represented Vincent Marino in the Carrozza case.  See United States v. Ramirez-Benitez, 292 F.3d 22, 29 (1st Cir. 2002) ("Representation of co-indictees by members of the same law firm may create a conflict of interest similar to that when a single attorney represents two or more co-defendants.").  Paul A. argues there was some evidence that

-72-

Minotti had additional information about Silva's murder, owned some of the guns found in Silva's apartment, and had told an acquaintance that he had participated in the Stevens robbery. Salsberg's partner withdrew his representation of Minotti when Salsberg was appointed to represent Paul A. Salsberg's motion for a writ of habeas corpus to procure Minotti's testimony was denied because the court concluded that his testimony would be inadmissible. As for Marino, Paul A. does not describe what, if any, work Salsberg's associate might have done on Marino's case at his prior firm. The court did approve Salsberg's motion requesting Marino's transport from prison to testify but did not order the marshals to expedite the process; as a result, Marino never testified.

Prior to jury impanelment, Paul A. filed a pro se motion requesting new counsel, but that motion and the in-court discussion it generated focused on whether Salsberg was prepared for trial. Towards the very end of the trial, Paul A. filed a series of pro se motions requesting new counsel; those motions focused on Salsberg's alleged conflicts of interest. The court summarily denied these later pro se motions.

On appeal, Paul A. is mistaken as to the law: reversal is not automatic when a trial judge fails to conduct a proper inquiry into a potential conflict of interest. See Mickens v. Taylor, 535 U.S. 162, 170-73 (2002); United States v. Newton, 326 F.3d 253, 263-64 (1st Cir. 2003). This is because, as the Supreme Court has

explained, "defects in assistance [of counsel] that have no probable effect upon the trial's outcome do not establish a constitutional violation." Mickens, 535 U.S. at 166. Even if the possibility of a conflict of interest was apparent enough to require the trial court to conduct a formal inquiry into the issue -- a question that is not immediately clear on the facts of this case -- "the trial court's failure to make [that] inquiry does not reduce [Paul A.'s] burden of proof." Id. at 173-74; see also id. at 168-69 (discussing when a court has a duty to inquire into a potential conflict of interest). Paul A. still bears the burden of showing that the conflict of interest he alleges went beyond a "mere theoretical division of loyalties" and in fact "adversely affected his counsel's performance." Id. at 171, 174.[23]

This showing by a defendant of an actual conflict is less burdensome than that required to establish ineffective assistance of counsel claims. United States v. Burgos-Chaparro, 309 F.3d 50, 52 (1st Cir. 2002). Here the defendant must demonstrate that his

---

[23] Contrary to Paul A.'s assertions, nothing in Mickens suggests that the Court intended its holding to apply to only those cases in which the defendant did not raise a conflict of interest concern during the trial, nor does the automatic reversal rule of Holloway v. Arkansas, 435 U.S. 475 (1978) -- which the Mickens Court cabined very narrowly -- apply here where counsel did not himself object at trial. See Mickens, 535 U.S. at 168 (Holloway's automatic reversal rule applies "only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict" (emphasis added)). While Salsberg did raise other concerns before the trial court about his ability to represent Paul A., he never informed the court that he himself believed that he was unable to represent Paul A. due to a conflict of interest.

counsel's performance was affected by the conflict, but need not also establish that the difference in performance prejudiced him in the same sense as in an ineffective assistance claim. Id.[24] Showing an adverse effect, however, still requires more than mere speculation, id. at 53; the defendant "must show that [the attorney] might plausibly have pursued an alternative defense strategy, and that the alternative strategy was in conflict with, or may not have been pursued because of, [the attorney's] other loyalties or interests," Ramirez-Benitez, 292 F.3d at 30; see also United States v. Lachman, 521 F.3d 12, 21 (1st Cir. 2008). This Paul A. fails to do.

Paul A. makes no viable argument as to what Salsberg might have done differently. He accuses Salsberg of not obtaining Minotti's testimony, but Salsberg did attempt to procure Minotti's testimony; that the court denied the request for evidentiary reasons is unrelated to the question of Salsberg's allegedly divided loyalties. As for Marino, Paul A. accuses Salsberg of not actively interviewing Marino or requesting his appearance in a timely manner. This, however, is not an accusation that Salsberg

_____

[24] The Supreme Court in Mickens expressly did not reach the question of whether this "actual conflict" standard, requiring some showing of an actual adverse effect but not of prejudice, should apply to cases of successive representation, such as this one. Mickens, 535 U.S. at 176. Like the Mickens Court, we reserve this question for another day and grant Paul A. the benefit of the assumption that the actual conflict standard is available to him; from the record before us, we doubt Paul A. could otherwise muster a showing of prejudice.

failed to pursue an alternative defense strategy, but that he did not pursue Paul A.'s desired strategy to Paul A.'s satisfaction. Cf. Lachman, 521 F.3d at 21-22 (finding no conflict of interest where counsel did present defendant's desired defense theory).[25] Nor does Paul A. clarify how any inaction on Salsberg's part was in fact the manifestation of divided loyalties.[26] Cf. Burgos-Chaparro, 309 F.3d at 53 (defendant must offer some showing that attorney's alleged shortcomings were in fact due to divided loyalties).

There is thus no showing of an actual conflict of interest. This claim fails.

D.      Pre-Indictment Delay

Paul A. complains that the government could have brought the robbery- and drug-related charges in this case at the same time as the charges prosecuted in the Carrozza trial. He asserts that the failure to press these charges earlier was a tactical decision by the government and that he was prejudiced by having to mount a separate defense at the later DeCologero trial. We review the district court's refusal to dismiss the charges due to pre-

---

[25]     Such allegations might instead go to the effectiveness of Salsberg's representation, but that tack would likely fail for lack of prejudice -- required to establish an ineffectiveness of counsel claim -- resulting from these alleged shortcomings.

[26]     Paul A.'s argument that the failure of Tony Bucci to testify for the defense had anything to do with Salsberg's alleged conflicts of interest is simply not borne out by the record. The debate over Bucci's testimony revolved primarily around Bucci's Fifth Amendment rights; there is no indication that Salsberg tried to prevent Bucci from testifying due to the role of Minotti as a government witness in Bucci's concurrent criminal case.

indictment delay for abuse of discretion.  <u>Muñoz-Franco</u>, 487 F.3d at 58.  The court correctly determined there was no constitutional violation here.

Pre-indictment delay does not implicate the Sixth Amendment's Speedy Trial provision, but the Supreme Court has acknowledged that the Due Process Clause of the Fifth Amendment "has a limited role to play in protecting against oppressive [pre-indictment] delay."  <u>United States</u> v. <u>Lovasco</u>, 431 U.S. 783, 789 (1977) (summarizing <u>United States</u> v. <u>Marion</u>, 404 U.S. 307, 324 (1971)).  The Due Process Clause has only a limited role in this context because the statutes of limitations provide the primary protection against undue pre-indictment delays.  <u>Id.</u>; <u>Soto-Beníquez</u>, 356 F.3d at 25.  To rise to the level of a due process violation despite the applicable statute of limitations not having run, the delay (1) must have "caused substantial prejudice to [defendant's] rights to a fair trial" and (2) "was an intentional device" used by the prosecution "to gain tactical advantage over the accused."  <u>Marion</u>, 404 U.S. at 324; <u>see</u> <u>also</u> <u>Soto-Beníquez</u>, 356 F.3d at 25.  "Substantial prejudice" means more than inconvenience; it requires a showing of actual prejudice, and even the unavailability of witnesses or evidence might not be sufficient to meet this burden.  <u>See</u> <u>Muñoz-Franco</u>, 487 F.3d at 59.

Paul A. argues that the separate trials prevented him from developing his defense -- that Regan worked for Salemme and was framing Paul A. in the context of the war between the Carrozza

and Salemme factions -- in the second case. The exclusion of some evidence in the present trial did not cause Paul A. substantial prejudice, as he was still allowed to present his defense theory to the jury, even if not to the full extent he desired.

There is also no evidence suggesting a prosecutorial purpose of obtaining tactical advantage as there is no evidence that the prosecution knew in 1997 what Paul A.'s defense would be in the present case.

There is, on the other hand, a reasonable explanation for the prosecution's delay. As Lovasco makes clear, prosecutors retain discretion to delay charges until investigations are complete and all other considerations have been weighed. Lovasco, 431 U.S. at 790-91. Paul A. attempts to distinguish Lovasco by arguing that the delay here was not due to an ongoing investigation. First, ongoing investigations are not the only constitutionally acceptable explanations for pre-indictment delays. See id. 792-95. Second, Paul A. concedes that the investigation into Silva's murder was not completed at the time of the Carrozza trial. Contrary to Paul A.'s characterization, that crime was closely related to the other crimes charged in the present indictment: Silva's murder was an effort to avoid prosecution for and was thus part of the conspiracy to commit the robberies, drug dealing, and other crimes that Paul A. argues should have been prosecuted sooner. There was no unconstitutional pre-indictment delay.

E.        Denial of Continuances

We turn to the final issue on appeal.  After the court appointed Paul A. a new lawyer on September 23, 2004, it pushed the trial back from that week until January 9, 2006 -- a delay of fifteen months.  Defense counsel requested a further six-month continuance in November 2005, which the court denied.  On January 6, 2006, Paul A.'s attorney sought a one- or two-week continuance, which the court again denied.  Paul A. argues on appeal that the court's refusal to grant these continuances violated his Sixth Amendment right to effective assistance of counsel.  We disagree.

We review for abuse of discretion a district court's denial of a motion for continuance.  Rodriguez-Marrero, 390 F.3d at 21-22.  "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel."  Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)).  "A defendant is generally not entitled to a new trial unless he or she can identify specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense."  Rodriguez-Marrero, 390 F.3d at 22.

Paul A. points to no such prejudice.  Instead, he argues in general terms that his counsel did not have enough time to prepare.  This was a complex case with extensive discovery.  However, counsel was given twice as long as Paul A.'s formal

-80-

counsel had estimated would be necessary (even accounting for the new counsel's participation in another lengthy trial during those fifteen months). As the district court pointed out, conscientious lawyers will always feel that they could do more to prepare. The district court's decision to go forward after a fifteen-month delay was well within its discretion.[27]

V.

After careful review, we deny all appeals and affirm the district court and the convictions on all counts.

---

[27] Paul A. also argues that the district court abused its discretion in denying his motion for a continuance on the first day of trial so he could seek advice on his lawyer's potential conflict of interest, see supra. This motion was untimely, especially as the question of his representation had been thoroughly canvassed in pre-trial motion practice. See, e.g., Rodriguez-Marrero, 390 F.3d at 22. It was also, in the district court's view, a purely dilatory tactic.

Key:

G = Guilty

NG = Not Guilty

RA = Racketeering Act

(Some counts for which no defendants were convicted are not discussed in this opinion.)

| Count | Crime | Paul A. | Paul J. | John Jr. | Pavone |
|-------|-------|---------|---------|----------|--------|
| 1 | RICO Conspiracy | G | G | G | G |
| 2 | Substantive RICO | G | G | G | G |
| | RA 1-A: Conspiracy to Murder (Silva) | G | G | | |
| | RA 1-B: Attempted Murder (Silva) | G | G | | |
| | RA 1-C: Murder (Silva) | G | | | |
| | RA 1-D: Witness Tampering (Attempt to Kill) | G | G | | |
| | RA 1-E: Witness Tampering (Killing) | G | | | |
| | RA 2: Witness Tampering (Misleading) | G | G | | G |
| | RA 3: Hobbs Act Conspiracy (Robbery) | G | G | G | NG |
| | RA 4-A: Hobbs Act Robbery (Godreau) | NG | | NG | NG |
| | RA 4-B: Possession of Marijuana with Intent to Distribute | NG | | NG | NG |
| | RA 4-C: Kidnaping (Godreau) | NG | | NG | |

| Count | Crime | Paul A. | Paul J. | John Jr. | Pavone |
|-------|-------|---------|---------|----------|--------|
| | RA 4-D: Armed Robbery (Godreau) | NG | | NG | NG |
| | RA 5-A: Hobbs Act Robbery (Stevens) | G | | | |
| | RA 5-B: Possession of Marijuana with Intent to Distribute | G | | | |
| | RA 5-C: Kidnaping (Stevens) | G | | | |
| | RA 5-D: Armed Robbery (Stevens) | G | | | |
| | RA 5-E: Kidnaping (Diaz) | G | | | |
| | RA 5-F: Kidnaping (Mahlo) | G | | | |
| | RA 6-A: Hobbs Act Robbery (Sapochetti) | NG | NG | NG | |
| | RA 6-B: Kidnaping (Sapochetti) | G | NG | G | |
| | RA 6-C: Kidnaping (Bolger) | G | NG | G | |
| | RA 6-D: Kidnaping (Sullivan) | G | NG | G | |
| | RA 7: Hobbs Act Robbery (North)[28] | NG | | NG | |
| | RA 8-A: Hobbs Act Robbery (Soccorso) | NG | | NG | |
| | RA 8-B: Armed Robbery (Soccorso) | G | | G | |
| | RA 8-C: Kidnaping (Soccorso) | G | | G | |
| | RA 8-D: Kidnaping (Ramus) | G | | G | |

---

[28]   This RA charged a robbery of North prior to the October 1996 burglary of North's apartment.

| Count | Crime | Paul A. | Paul J. | John Jr. | Pavone |
|---|---|---|---|---|---|
| | RA 8-E: Possession of Marijuana with Intent to Distribute | G | | G | |
| | RA 9-A: Hobbs Act Robbery (Pesaturo) | G | G | G | |
| | RA 9-B: Hobbs Act Robbery (Bentley) | G | G | G | |
| | RA 9-C: Kidnaping (Pesaturo) | G | G | G | |
| | RA 9-D: Kidnaping (Bentley) | G | G | G | |
| | RA 9-E: Possession of Cocaine with Intent to Distribute | G | G | G | |
| | RA 10-A: Attempted Hobbs Act Robbery (Pollard) | NG | | NG | |
| | RA 10-B: Kidnaping (Pollard) | NG | | NG | |
| | RA 11: Conspiracy to Possess Marijuana with Intent to Distribute (North) | G | G | | |
| | RA 12: Conspiracy to Possess Cocaine with Intent to Distribute (Silva) | G | G | | |
| | RA 13: Possession of Cocaine with Intent to Distribute | G | | NG | |
| | RA 14: Extortion (Finethy) | G | | G | G |
| 3 | Conspiracy to Tamper with a Witness | G | G | | G |
| 4 | Tampering with a Witness (Misleading) | G | G | | G |

| Count | Crime | Paul A. | Paul J. | John Jr. | Pavone |
|-------|-------|---------|---------|----------|--------|
| 5 | Tampering with a Witness (Attempted Murder) | G | G | | |
| 6 | Tampering with a Witness (Murder) | G | | | |
| 7 | Hobbs Act Conspiracy (Robbery) | G | G | G | NG |
| 8 | Hobbs Act Robbery (Stevens) | G | | | |
| 9 | Possession of Marijuana with Intent to Distribute (Stevens) | G | | | |
| 10 | Using/Carrying a Firearm (Stevens) | G | | | |
| 11 | Hobbs Act Robbery (Sapochetti) | NG | NG | NG | |
| 12 | Using/Carrying a Firearm (Sapochetti) | G | NG | G | |
| 13 | Hobbs Act Robbery (Godreau) | NG | | NG | NG |
| 14 | Possession of Marijuana with Intent to Distribute | NG | | NG | NG |
| 15 | Using/Carrying a Firearm (Godreau) | NG | | NG | |
| 16 | Conspiracy to Possess Marijuana with Intent to Distribute (North) | G | G | | |
| 17 | Felon-in-Possession of a Firearm | G | G | | |
| 18 | Conspiracy to Possess Cocaine with Intent to Distribute (Silva) | G | G | | |